**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**May 11, 2012**

# In the Court of Appeals of Georgia

A12A0309 WINDHOM v. THE STATE.

ADAMS, Judge.

Errol Windhom appeals his conviction of armed robbery. He challenges the sufficiency of the evidence; he also contends the trial court erred by not declaring a mistrial following an officer's testimony, by failing to give seven of his requested jury charges, and by sentencing him in violation of the Georgia and United States Constitutions. We reverse and remand for new trial.

Construed in favor of the verdict, the evidence, including the testimony of co-defendant Christopher Graddick, shows that on May 18, 2009, Graddick, Michael Shane Bedford, and Alex Williams went to the A&Z Flower and Game Shop. While there, Bedford talked about robbing the store, they all stayed about 30 minutes, but they decided to leave without taking any action.

Graddick testified that the next day, Windhom, whom Graddick had known for about a year, called him and asked him to come over to his house. Graddick testified, "[Windhom] said he was going to go play the machines, so we went to play the machines." So, Windhom, driving his red Volvo, took Graddick, picked up Bedford, and dropped them off at one end of the shopping center where the A&Z shop was located. Graddick testified that during the ride, Windhom had given Bedford his .38 caliber handgun. Windhom then drove to the other end of the shopping center and parked directly in front of the A&Z shop. Graddick testified that Windhom called him and Bedford at one point. Once inside, Windhom played some video games and had a conversation with Melissa Ann Amin, the florist and only shopkeeper present at the time. Amin testified that Windhom was a regular customer, that he even parked in the same place most days, and that he "came in, as usual, like he does mostly every day." She had never seen him with the robbers before. Windhom was in the shop for 30 to 45 minutes before the robbery. At one point, he received a call on his cell phone; he told Amin that it was from his daughter.

At some point, Graddick and Bedford approached the shop and waited for Windhom to come out. According to Graddick, when Windhom failed to come out, they entered the shop with Bedford holding the gun. As they did, Windhom

2

exclaimed, "Oh no," and Amin looked and saw two men enter. The robber with a gun was dressed in a black cap, black pants, and a long-sleeved black shirt, and he "had a black thing over his mouth and nose." Because she was paying attention to the gunman, she did not recall what the other robber was wearing. Nevertheless, Amin recognized both robbers as the two men who had been there the day before; she apparently saw a tattoo under one eye on the gunman that she had seen the day before. That person pointed the gun at her face, threatened her life, and demanded that she hand over everything. She gave him her cell phone, cigarettes, and money. They also had her open the register, but she had not put any cash in it at that time. Windhom was standing right in front of Amin when the robbers came in, but they did not rob him. The robbers made Windhom lie on the ground, and they forced Amin into the bathroom and told her to stay there for ten to fifteen minutes. Amin heard noises for several minutes afterwards but came out after five or ten minutes after it got quiet; she then sought help. The robbers and Windhom were gone when she came out, and Windhom's car was gone, as well.

Other evidence showed that while Amin was in the bathroom, Graddick and Bedford exited the shop followed sometime later by Windhom. A video recording showed Graddick and Bedford leaving the shop after the robbery and then showed

3

Windhom getting into his car and driving off. Graddick and Bedford walked down the road while Windhom got in his car, drove to their location, and, according to Graddick, picked them up. Graddick testified that he rode in the front passenger seat while Bedford counted money in the back and that Windhom asked Bedford how much money they got. Windhom dropped off Bedford at his home, and he and Graddick went to Windhom's house. Graddick specifically testified that Windhom was a part of the robbery and that he, Graddick, was not. He testified that Windhom "was the one that set it up"; but he also testified that he did not hear Windhom talk about a robbery before it happened. Graddick testified that he did not get any of the money. He testified equivocally that he thought that Bedford and Windhom took the money.

A witness who was driving near the shopping center at the time of the robbery saw a red Volvo come out of the parking lot and stop to pick up a male, who got in the back seat.

Windhom testified and admitted that he drove Graddick and Bedford to the shopping center, that he went into the A&Z shop, that the shop was robbed while he was there, that one of the robbers had a gun, that he drove off in his car and saw Graddick and Bedford walking, and that he talked to them but did not pick them up.

4

He denied knowing about or participating in the robbery; he testified that he drove the others to the shopping center because they told him they needed to pick up Graddick's aunt's car, which was parked there. He also testified that he did not recognize the robbers because they had changed their clothes and were wearing masks and that when he spoke to them after the robbery, he demanded to know what they were doing. But he admitted that he never called the police to report a robbery. He told an investigating officer that the gun belonged to Graddick.

1. We review the case "under the standard espoused in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979) to determine if the evidence, when viewed in the light most favorable to the prosecution, supports the verdict." (Citation omitted.) *Mack v. State*, 272 Ga. 415, 416-417 (1) (529 SE2d 132) (2000). Armed robbery requires proof of intent to commit theft and taking property from another using an offensive weapon:

> A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon.

OCGA § 16-8-41. Here, evidence was presented showing that Windhom planned the robbery, drove the robbers to the scene, supplied the weapon, functioned as a lookout,

5

drove the getaway vehicle, and inquired about the proceeds of the crime. The evidence was sufficient to show that he was a party to an armed robbery.

2. Windhom contends the trial court erred by not declaring a mistrial based on the testimony of an investigating officer. On direct examination for the State, Officer Russell testified about the contents of a statement that Windhom made to the officers investigating the crime. As a part of his testimony, Russell testified about statements he made to Windhom at that time. One such statement was that based on the way that Windhom and the robbers acted during the robbery, the victim (and possibly the officers themselves) believed that the robbers and Windhom had acted in concert. The full statement was

> We told him the white female employee, Melissa Ann Amin, told us that the robbers, Christopher and Shane Bedford, laid him on the floor very gently or very easy as if they did not want to hurt him. We told him that made him (sic) believe that the three of them were together. Melissa Ann Amin believed the same thing.

Windhom objected on the ground that the statement was hearsay, which the court sustained. Windhom also moved for a mistrial and asked the court to instruct the jury that they should disregard the statement on the ground that it was improper testimony regarding whether to believe the defendant's story and an improper

6

invasion of the province of the jury. The court denied the motion for mistrial and denied the request for a limiting instruction. The court reasoned that the comment showed the context of the conversation and that it was not an opinion as to the believability of the defendant's testimony.

On appeal our review is limited to the specific grounds raised in the objections at trial; other possible grounds for excluding the testimony have been waived. *Mullins v. State*, 280 Ga. App. 689, 692 (3) (634 SE2d 850) (2006). We review denial of a mistrial for admission of improper evidence "for abuse of discretion by examining factors and circumstances, including 'the nature of the statement, the other evidence in the case, and the action taken by the court and counsel concerning the impropriety.' [Cit.]" *White v. State*, 268 Ga. 28, 32 (4) (486 SE2d 338) (1997).

It is true that "a witness, even an expert, can never bolster the credibility of another witness as to whether the witness is telling the truth." (Citations and punctuation omitted.) *Mann v. State*, 252 Ga. App. 70, 72 (1) (555 SE2d 527) (2001). And, "Georgia law generally precludes a witness from testifying as to his or her opinion regarding an ultimate issue in the case because to do so would invade the province of the jury." *Glover v. State*, 292 Ga. App. 22, 27 (4) (663 SE2d 772) (2008).

7

"The Supreme Court of Georgia, however, has viewed police comments during interrogations differently from sworn trial testimony." *Axelburg v. State*, 294 Ga. App. 612, 616 (2) (669 SE2d 439) (2008) (error to admit several comments by officer during interrogation that he did not believe defendant's story that he accosted the victim while sleepwalking).

> In *Hames v. State*, [cit.] the Court distinguished interrogation comments from sworn testimony and stated that comments made in that case "appear[ed] to reflect only an aggressive interrogation technique designed to test the truthfulness of (the defendant's) denial of (the requisite intent)." [Cit.] Similarly, in *Rowe v. State*, [Cit.] the court held that "(w)hat (the defendant) characterizes as inadmissible statements by (the interrogator) regarding his theory of the case was nothing more than police questioning aimed at eliciting responses from a defendant in custody." [Cit.] Other decisions of the Supreme Court of Georgia also emphasize the latitude given police interrogators in interviews that ultimately are admitted into evidence. [Cit.] Likewise, courts in other jurisdictions have acknowledged the need for such interrogation techniques and under certain circumstances have allowed into evidence unredacted interview statements containing such techniques. [Cits.]

Id. at 616-617 (2).

This exception, however, has limits. In *Axelburg*, the officer essentially asserted that he was an expert in sleepwalking and forensic interviewing, that he

8

could tell when someone was lying, and that he thought the defendant was lying about his sleepwalking story. Id. at 618 (2). This Court held that the officer's comments exceeded those limits:

> Because the officer's opinion on this disputed question directly addressed Axelburg's defense, that he lacked the requisite intent to commit the offense, we do not find that allowing the jury to hear this opinion was harmless or that the limiting instruction mitigated this harm.

Id.

Here, the relevant testimony is hearsay from the victim that based on the way that Windhom and the robbers acted during the robbery, the victim and, implicitly, the officers, believed that the robbers and Windhom had acted in concert. The ultimate issue in this case is that very question. See, e.g., *Fordham v. State*, 254 Ga. 59, 60 (4) (325 SE2d 755) (1985) (where issue was whether defendant killed with malice or with justification, it was improper for officer to testify that there was nothing in the defendant's statements that would justify the killing). Furthermore, unlike the interrogation comments cases, here, the testimony came in as sworn testimony, not just recorded interrogation comments; the officer was testifying live about Windhom's statement when he added his own unsolicited recollection of the interrogation questions he asked Windhom, which included the victim's hearsay

9

statement. We cannot even be sure whether the officer's testimony accurately reflected his actual "aggressive interrogation technique." See *Towry v. State*, 304 Ga. App. 139, 146 (695 SE2d 683) (2010 (distinguishing sworn testimony of a trial witness from comments on a video recording of the interrogation).

Also, the victim did not testify to the same information that the officer reported. She did not testify that Windhom's or the robbers' behavior during the robbery made her believe that Windhom was an accomplice. In fact, she specifically denied that he did anything during the robbery to give her the impression that he was trying to help the robbers, although she did testify that the fact that he left afterwards gave her an indication that he might be involved. Even so, the officer's testimony was not duplicative of Amin's and therefore not duplicative of other admissible testimony.

In sum, we conclude that the evidence should not have been admitted. Without a limiting instruction, the harm was not mitigated, and given that the only direct evidence of Windhom participating in the crime was the testimony of a co-defendant who had been declared incompetent to stand for his own trial , we cannot say the error was harmless. Therefore Windhom was entitled to a mistrial. Because some of the remaining asserted errors could occur upon retrial, depending on the evidence produced at the second trial, we will address them.

3. Windhom contends the trial court erred by failing to give seven of his proposed jury charges.

> [A] trial court does not err in refusing to give a requested instruction in the exact language requested where the charges given in their totality substantially and adequately cover the principles contained in the requested charge.

*Massey v. State*, 270 Ga. 76, 78 (4) (508 SE2d 149) (1998). See also *Harrison v. State*, 309 Ga. App. 454, 457 (2) (a) (711 SE2d 35) (2011).

(a) Windhom contends the court should have given his requested charge on identification because the passerby testified that a black man in a red Volvo picked up a person on the road shortly after the robbery but she was not able to identify Windhom as that man. He contends this creates an issue of fact as to whether he was the person in the red Volvo who picked up the robbers. But Windhom placed himself at the scene of the robbery, admitted that he drove a red Volvo, and even placed himself in his car after the robbery, leaving the scene and stopping to talk to one of the co-defendants, although he denied picking him up. Furthermore, the passerby did not identify Windhom as the man in the red Volvo. The jury was at liberty to consider the possibility that a second red Volvo came along after Windhom and picked up the

11

co-defendant. As the facts were presented at the first trial, this issue did not depend on witness identification, and therefore we find no error.

(b) Windhom contends the court should have given his requested charge on the motive of a witness to testify because the jury needed the instruction to be able to evaluate the testimony of co-defendant Graddick, who had been found incompetent to stand trial and who may have been motivated to alter his testimony to favor the State's case. But the court instructed on credibility of witnesses, the interest of a witness, impeachment, and motive of a witness. Our review of these charges show that they substantially and adequately cover the principles contained in the requested charge.

(c) Windhom contends the court should have given his requested charge on aiding and abetting in order to show that he should not be found guilty just because he knew the two robbers or was merely present at the scene. But the trial court instructed the jury on mere presence, parties to a crime, knowledge of a crime, guilt by mere association, and grave suspicion. Our review of these charges show that they substantially and adequately cover the principles contained in the requested charge.

(d) Windhom contends the court should have given his requested charge that mere approval of an act, not amounting to encouragement, is not it itself, standing

alone, sufficient to justify a conviction. See generally *Brown v. State*, 250 Ga. 862 (1) (302 SE2d 347) (1983). But, at the first trial, there was no evidence that Windhom merely approved the act. He either provided the gun, operated as a lookout, and drove the getaway vehicle, as Graddick testified, or he had no idea that Graddick and Bedford were going to rob anyone, as he testified. It was up to the jury to resolve this factual issue. Where there is no evidence supporting a requested charge, it is not error to deny the request. *Monsalve v. State*, 271 Ga. 523, 526 (3) (519 SE2d 915) (1999).

(e) Windhom contends the court should have given his requested charge on mistake of fact, that is that the State has the burden of showing that the defendant did not act as a result of a mistake of fact. See OCGA § 16-3-5. He testified that he took the robbers to the shopping center under the mistaken belief that they simply needed a ride to pick up a car that was parked there, not to commit a robbery. In order to justify the charge, Windhom would need to be able to show some evidence that "the act or omission to act constituting the crime was induced by a misapprehension of fact." Id.

Here, Windhom's conviction was based on direct and circumstantial evidence. It was based on the direct evidence in the form of Graddick's testimony that Windhom planned the crime, provided the gun, and functioned as the driver and

13

lookout, all while knowing of the plan to rob, i.e., intent to commit theft. But the remaining evidence, most of which Windhom admitted, provided only circumstantial evidence of intent to commit theft: that he drove the robbers to the scene of the crime; that he went to the shop and received a phone call; that he was present during the robbery; that he was not robbed; and that he drove the robbers away from the scene of the crime. Without Graddick's testimony, however, there would be no evidence that Windhom knew in advance of the plan to rob the store. And Windhom testified that the reason he drove the other two perpetrators to the shopping center was that they told him they simply needed a ride there to pick up a car; he also testified that he was surprised by the robbery and that he only spoke to the robbers afterward to ask them what they had done and why.

A mistake of fact "is a defense to a crime to the extent that the ignorance of some fact negates the existence of the mental state required to establish a material element of the crime." *Jones v. State*, 263 Ga. 835, 839 (2) (439 SE2d 645) (1994). As shown, Windhom's knowledge of a plan or intent to rob is a material element of the charge against him. If he lacked that knowledge and did not provide the gun; went to the store just to play games (which the victim acknowledged was his habit, and even Graddick seemed to corroborate at one point); and did not recognize the robbers

14

because they were masked (which the victim confirmed as to the gunman), then he would not be guilty of armed robbery. Under that scenario, Windhom would have been duped into driving and then caught in the store that Graddick and Bedford chose to rob even though they knew Windhom was inside.

Therefore, based on the evidence at the first trial, the trial court should have given Windhom's requested charge on mistake of fact. Although our review shows that the remainder of the jury charge fairly presented the issue to the jury such that, standing alone, it might not amount to reversible error, *Price v. State*, 289 Ga. 459, 460 (2) (712 SE2d 828) (2011), the better practice would be to give the charge.

(f) Windhom contends the court should have given his requested charge on hindering the apprehension of a criminal as a lesser included offense. See OCGA § 16-10-50. "[T]he offense of hindering the apprehension of a criminal, see OCGA § 16-10-50, is the equivalent of the common law crime of being an accessory after the fact." *Hampton v. State*, 289 Ga. 621, 622 (713 SE2d 851) (2011). And, it is not a lesser included offense of the principal crime but a separate offense. See id.; *Vergara v. State*, 287 Ga. 194, 198 (3) (a) (695 SE2d 215) (2010); *Hill v. State*, 221 Ga. 65, 67 (6) (142 SE2d 909) (1965).

15

(g) Finally, Windhom contends the court should have given his requested charge on opinion evidence based on the officer's improper testimony addressed in Division 2, herein. Because that aspect of the officer's testimony will be inadmissible at the second trial, this enumeration is now moot.

4. In his final enumeration of error, Windhom contends that his sentence of 20 years to serve amounts to cruel and unusual punishment. But given that a second trial will take place, we need not address this enumeration.

*Judgment reversed and case remanded for new trial. Barnes, P. J., and McFadden, J., concur.*