**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**October 12, 2012**

# In the Court of Appeals of Georgia

A12A1552. JONES v. THE STATE.

DILLARD, Judge.

Following a jury trial, Nickholas Jones was convicted of six counts of aggravated assault and one count of participating in criminal street-gang activity. On appeal, Jones contends that the evidence was insufficient to support his convictions and that the trial court erred in (1) excluding two witnesses' testimony regarding telephone conversations; (2) denying several of his requests to charge the jury on motive, mere presence, and aiding and abetting; and (3) denying his motion for severance. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that on the night of September 19, 2009, R. M. picked up his friends, M. B., K. M.,

---

[1] *See Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

T. L., D. D., and D. J.,[2] in his mother's SUV and drove to a birthday party for a local teenage girl that was being hosted by the Black Velvet Lounge in Macon, Georgia. With invitations spread by word-of-mouth and text messages, the party was attended by over 100 teenagers. The event was monitored by the nightclub's security personnel, and most of the attendees were searched for weapons before being allowed on the premises. But shortly before midnight, a fight started between some of the guests. The nightclub's security guards quickly intervened to stop the fight, and after calling police, the club's security guards and police officers shut down the party and ordered everyone to leave.

Upon departing from the club, R. M. and his five friends—none of whom had been involved in the fight—returned to their SUV and started to drive home. A few blocks away from the club, R. M. slowed the vehicle so that he and his friends could speak with a group of girls they knew, who were walking home from the party. As the vehicle slowed, T. L. yelled "Bloomfield" at the girls, referencing the neighborhood from which he and his friends in the SUV hailed. A moment or two following this brief encounter, gunfire erupted from some nearby abandoned buildings on the left

---

[2] Because many of the victims and witnesses in this case were minors at the time of the incident, we refer to them by their initials only.

side of the street and several bullets struck the SUV, wounding both K. M. and D. J. R. M. then sped off and, within a few minutes, came upon a police officer who was responding to a call that gunshots had been fired near the Black Velvet Lounge. After bringing the SUV to a halt, R. M. and his friends, except for D. J. who was unconscious, spilled out of the vehicle and informed the officer that D. J. and K. M. had been shot. The officer immediately called an ambulance, and D. J. and K. M. were taken to the hospital.

Thereafter, the remaining occupants of the SUV traveled to the police station to provide statements, but none of them witnessed who fired shots at the vehicle. However, law enforcement's investigation of the incident was aided by some of the girls who had spoken with the occupants of the SUV just prior to the shooting. Specifically, one of those girls, I. G., informed the police that she saw Yovanis Whisby, Jamarcus Adams, Charles Iwo, and Nickholas Jones shoot at the SUV. I. G. also advised the police that all four of the young men were members of a local street gang, the Bottomside Gangster Boys, that operated on the south side of Macon. In addition, two of the girls who were with I. G. that evening told the police during their interviews that although they did not see who actually perpetrated the shooting, Adams approached them and warned them to move out of the way just prior to the

3

shooting. Furthermore, one of the girls stated that Iwo and Jones were with Adams when he issued the warning.

Based on the foregoing information, the lead detective investigating the shooting arrested Whisby and questioned him regarding the incident. During that interview, Whisby admitted that he, Adams, Iwo, and Jones were outside of the Black Velvet Lounge on the night in question and that Adams, Iwo, and Jones were armed with handguns and shot at the victims' SUV. Consequently, Adams, Iwo, and Jones were also arrested, and all four were jointly charged, via a single indictment, with six counts of aggravated assault with a deadly weapon[3] and one count of participation in criminal street-gang activity.[4]

Thereafter, Iwo and Jones were jointly tried on the charges.[5] During the trial, the six occupants of the targeted SUV testified about the incident but admitted that they had not seen the gunmen. However, two of the occupants, T. L. and his brother, D. D., recounted an incident involving Jones that occurred approximately three weeks prior to the shooting. Specifically, T. L. and D. D. testified that on August 28, 2009,

---

[3] *See* OCGA § 16-5-21 (a) (2).

[4] *See* OCGA § 16-15-4 (a).

[5] Adams and Whisby pleaded guilty to charges related to the shooting.

the school bus had just dropped them off at their stop when they were approached by Jones and several other young men, all of whom were claiming affiliation with the Bottomside Gangster Boys. T. L. responded by exclaiming "Bloomfield" and a fight ensued, which ended with Jones firing a handgun at the ground near T. L. and then fleeing with the rest of the crowd.

The State also offered the testimony of the girls who spoke to the SUV occupants just prior to the shooting, including I. G. And although I. G. testified at trial that she saw Iwo and Jones with guns but did not witness the actual shooting, the investigating detective who interviewed I. G. testified regarding her initial statement, in which she claimed that both defendants shot at the victims' SUV. In addition, the State called Yovanis Whisby as a witness. However, after Whisby claimed at trial that he and his friends were outside the club that night but were not involved in the shooting, the State—through the testimony of the same investigating detective and a video recording of Whisby's custodial interview—introduced Whisby's earlier statement to the police, which implicated Iwo and Jones in the shooting.

At the conclusion of the trial, the jury found both Iwo and Jones guilty on all counts of the indictment. Thereafter, Jones filed a motion for new trial, which the trial court denied. This appeal follows.

1. Jones contends that the evidence was insufficient to support his convictions. We disagree.

At the outset, we note that when a criminal conviction is appealed, the evidence must be viewed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence.[6] And in evaluating the sufficiency of the evidence, "we do not weigh the evidence or determine witness credibility, but only determine whether a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt."[7] Thus, the jury's verdict will be upheld "[a]s long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case."[8] With these guiding principles in mind, we now address Jones's specific challenges to the sufficiency of the evidence.

(a) *Aggravated assault with a deadly weapon.* Jones was charged with six counts of aggravated assault under OCGA § 16-5-21 (a) (2), which provides that "[a] person commits the offense of aggravated assault when he or she assaults [w]ith a

---

[6] *See English v. State*, 301 Ga. App. 842, 842 (689 SE2d 130) (2010).

[7] *Joiner v. State*, 299 Ga. App. 300, 300 (682 SE2d 381) (2009); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[8] *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001) (punctuation omitted).

deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury."[9] Furthermore, it is well settled that "the act of firing a weapon into a group makes each individual in the group a separate victim and justifies a separate count of aggravated assault for each victim."[10]

In the case *sub judice*, there was evidence showing that Jones, Iwo, Adams, and Whisby were present outside the Black Velvet Lounge on the night in question, shot at the victims' SUV, and wounded two of the victims in the process. Nevertheless, Jones argues that the evidence was insufficient because both Whisby and I. G.'s respective statements implicating him in the shooting were inconsistent with their trial testimony and, therefore, lacked credibility. However, any alleged inconsistencies in the evidence and issues of the witnesses' credibility "were for the jury, not this Court, to resolve. . . ."[11] And here, the jury obviously resolved those issues against Jones. Accordingly, the evidence was sufficient to allow the jury to

---

[9] OCGA § 16-5-21 (a) (2).

[10] *Martin-Argaw v. State*, 311 Ga. App. 609, 612 (1) (716 SE2d 737) (2011) (punctuation omitted).

[11] *Id.* at 613 (2) (punctuation and citation omitted).

7

find that Jones was guilty of the charges of aggravated assault beyond a reasonable doubt.[12]

(b) *Participation in criminal street gang activity.* Jones was also charged with one count of participation in criminal street-gang activity under OCGA § 16-15-4 (a), which makes it unlawful for persons associated with a "criminal street gang" to engage in "criminal gang activity" by committing certain enumerated predicate offenses, including aggravated assault.[13] A "criminal street gang" is defined as a "group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity. . . ."[14] And the statute clearly contemplates that the existence of such an organization, and that its members are "associated in fact," may be established by "evidence of a common name or common identifying signs, symbols, tattoos, graffiti, or attire or other distinguishing characteristics. . . ."[15]

---

[12] *See Adkins v. State*, 279 Ga. 424, 425-26 (2) (614 SE2d 67) (2005) (holding that evidence that defendant participated in a drive-by shooting was sufficient to support aggravated-assault conviction); *Martin-Argaw*, 311 Ga. App. at 611-12 (1) (finding that evidence that defendant fired a handgun at a group of people was sufficient to support defendant's aggravated-assault convictions).

[13] *See* OCGA § 16-15-3 (1) (j).

[14] *See* OCGA § 16-15-3 (2).

[15] *See id.*

Additionally, our Supreme Court has held that a conviction under OCGA § 16-15-4 (a) requires that there "be some nexus between the [enumerated] act and an intent to further street gang activity."[16]

Here, I. G., in her initial statement to the police, claimed that Jones was a member of the Bottomside Gangster Boys, and both T. L. and D. D. testified that Jones touted his affiliation with the gang during the fight at the school bus stop that occurred nearly three weeks prior to the shooting outside the nightclub. Thus, there was some evidence that Jones was a member of an existing street gang that was involved in ongoing criminal gang activities.[17] Furthermore, given that T. L. and D. D. were also occupants of the SUV that Jones targeted, an inference could be drawn that the shooting outside the nightclub was related to the fight at the bus stop and

---

[16] *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009) (punctuation omitted).

[17] *See Morey v. State*, 312 Ga. App. 678, 686 (2) (b) (719 SE2d 504) (2011) (holding that evidence that defendant participated in aggravated assaults with friends wearing clothing bearing gang symbols and who earlier that same day engaged in stalking and making terroristic threats against different victims was sufficient to show that defendant was a member of a criminal street gang). *Compare In the Interest of A. G.*, ___ Ga. App. ___, Slip op. at 6-7 (Case No. A12A0005; decided July 11, 2012) (reversing participation in criminal street-gang conviction when, *inter alia*, State failed to show evidence describing defendant's gang or that the gang was involved in criminal activities); *In the Interest of A. D.*, 311 Ga. App. 384, 386 (715 SE2d 787) (2011) (same).

therefore was related to that earlier criminal gang activity.[18] Accordingly, the evidence was sufficient to support Jones's conviction of participation in criminal street-gang activity.

2. Jones also maintains that the trial court erred in precluding two of the defense's witnesses from testifying about telephone conversations they had with I. G., in which she allegedly denied having seen who shot at the victims' SUV. This contention is a nonstarter.

It is well established that "[t]he admission of evidence is committed to the sound legal discretion of the presiding judge, whose determinations will not be disturbed on appeal unless they constitute an abuse of that discretion."[19] But with specific regard to telephone conversations, our Supreme Court has long required "that there be a sufficient basis for a witness to identify a person with whom he spoke over

---

[18] *See Morey*, 312 Ga. App. at 686-87 (holding that defendant and his street gang's aggravated assault on victims shortly after defendant and his gang unsuccessfully attempted to attack others satisfied "the requirement that the 'criminal gang activity' was ongoing at the time of the incidents underlying the charged offenses").

[19] *Patterson v. State*, 287 Ga. App. 100, 100 (650 SE2d 770) (2007) (punctuation omitted).

the telephone, before testifying as to the contents of the conversation."[20] Obviously, one way to authenticate the identity of the speaker in a telephone conversation is "direct testimony of voice recognition."[21] Additionally, sufficient evidence for authentication has also been recognized "where the party sought to be charged not only identifies himself over the telephone, but also later corroborates the conversation."[22] Nevertheless,

> the testimony of one person to a conversation had with another person over a telephone, in which the person testifying did not know the other person or recognize the other's voice, had not at that time ever heard the voice, and had never heard it since, and the identity of the other person had not been established otherwise than by what was said in the conversation itself, is hearsay and inadmissible. . . .[23]

Indeed, this Court has previously held that "if the witness does not know a person and places a telephone call to the person's place of business or personal telephone number, and asks for that person, these circumstances are not sufficiently reliable to

---

[20] *Brown v. State*, 266 Ga. 723, 725 (3) (470 SE2d 652) (1996).

[21] *Patterson*, 287 Ga. App. at 101 (1) (punctuation omitted).

[22] *Id.* at 102 (1).

[23] *Id.* (punctuation omitted).

11

authenticate the identity of the person who comes to the telephone, even if that person identifies himself."[24]

In this matter, during Jones's cross-examination of I. G., defense counsel asked her if she recalled a telephone conversation that she allegedly had with an investigator for the public defender's office. When I. G. responded negatively, defense counsel requested that he be allowed to impeach I. G. with testimony from the investigator, but the State objected that such testimony would be hearsay. Consequently, outside the presence of the jury, defense counsel questioned the investigator to lay a foundation for her testimony regarding the telephone conversation. During this examination, the investigator testified that she left a business card at I. G.'s residence and later received a telephone call from a female, stating that she was I. G.'s mother. After the investigator asked to speak with I. G., another female got on the line and provided a date of birth and mobile phone number that matched the records the investigator had concerning I. G. The investigator then testified that I. G. told her that

---

[24] *Id.* We note in passing that under OCGA § 24-9-901 (b) (6) (A) (effective Jan. 1, 2013) of the new Georgia Evidence Code, telephone conversations may be authenticated "by evidence that a call was made to the number assigned at the time by a telephone service provider to a particular person or business, if . . . [i]n the case of a person, circumstances, including self-identification, show the person answering to be the one called. . . ." *See* Ga. L. 2011, p. 99, § 2/H.B. 24.

she did not actually see who shot at the victims. However, on cross-examination, the investigator conceded that, prior to the phone call, she had never met I. G., never had any contact with her, and could not recognize her voice. Subsequently, the trial court ruled that the investigator's testimony regarding the phone call was inadmissible.

Later in the trial, counsel for Jones's co-defendant called an investigator with the local chapter of the NAACP to testify about a telephone conversation that she had with I. G. concerning the case.[25] When the State objected on hearsay grounds, I. G. was recalled as a witness and denied ever having such a conversation. Thereafter, the NAACP investigator was recalled and questioned outside the presence of the jury about the phone call. Similarly, the investigator testified that she called a phone number that she had been told belonged to I. G. and initially spoke to a woman claiming to be I. G.'s mother. Upon the investigator's request, the woman put a person on the line who identified herself as I. G. But, once again, on cross-examination the NAACP investigator admitted that she never met I. G. before the phone call and had no way of confirming the identity of the person with whom she spoke. The trial court, therefore, ruled that this testimony was likewise inadmissible.

_____

[25] The NAACP investigator became involved in the case at the behest of the mother of Jamarcus Adams based on her concerns with the manner in which law enforcement had allegedly treated witnesses.

Jones argues that both the public defender's investigator and the NAACP investigator's telephone conversations with I. G. were admissible because in both instances, the speaker identified herself as I. G. and confirmed her date of birth and phone number. Nevertheless, in both instances the evidence was insufficient to authenticate the identity of the person with whom the investigators spoke. Although the speaker allegedly identified herself as I. G. and verified her telephone number and date of birth, both investigators testified that they did not know I. G., had never spoken to her before, and would not recognize her voice. Thus, there was no evidence of voice recognition. Nor was there any evidence that I. G. later corroborated the telephone conversations. To the contrary, she denied ever speaking to either investigator. Given these circumstances, there was insufficient evidence to authenticate the actual identity of the speaker in either investigators' telephone conversation.[26] Accordingly, the trial court did not err in precluding the investigators'

---

[26] *See Patterson*, 287 Ga. App. at 102-03 (1) (holding that defendant's identity was not authenticated in a telephone conversation, and thus conversation was inadmissible, despite the fact the that defendant initiated the call to a police officer who had earlier been to his residence and had left a message with defendant's mother for defendant to call him); *Cannady v. Lamb*, 146 Ga. App. 850, 851-52 (3) (247 SE2d 500) (1978) (holding that identity not authenticated in a telephone conversation in which the witness obtained the telephone number from a person's father, and that person later confirmed that the number was correct).

14

testimony regarding their telephone conversations on the ground that such testimony constituted inadmissible hearsay.

3. Jones next contends that the trial court erred in denying his request to charge the jury on the issue of a witness's motive for testifying against a defendant. We disagree.

A trial court's refusal to give a requested jury charge is not error unless the request is "entirely correct and accurate; is adjusted to the pleadings, law, and evidence; and is not otherwise covered in the general charge."[27] And we review a trial court's refusal to give a requested jury charge under an abuse-of-discretion standard.[28]

In the case *sub judice*, in order to instruct the jury regarding the possible motives for Yovanis Whisby testifying as a witness for the State (despite the fact that there was no evidence that he did so as part of a plea deal), Jones requested the following charge:

> In evaluating the witness' [sic] motive for testifying against the defendant, the jury is authorized to consider whether the evidence shows bias or prejudice by the witness against the defendant. The jury may

---

[27] *See Turner v. State*, 314 Ga. App. 263, 264 (1) (724 SE2d 6) (2012) (punctuation omitted).

[28] *Id.* at 263-64 (1).

15

consider whether the testimony given by the witness was given under promise or expectation of immunity or lenient or light treatment. The jury may consider whether the testimony was given out of fear or intimidation by law enforcement officials. Whether or not such a deal exists is not crucial; what counts is whether or not the witness may be shading his testimony in an effort to please the prosecution. A desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness. The jury may consider whether the witness might tacitly assumes [sic] that he would receive some benefit by giving testimony favorable to the State, that is, did he have any hope in his mind as to favorable treatment. . . .

During the charge conference, the trial court noted its doubt as to the appropriateness of the requested charge. Ultimately, the court refused to give this charge and instead instructed the jury on the issue of credibility generally by stating: "In assessing the credibility of a witness, you may consider any possible motive or bias in testifying if shown by the evidence. You alone shall decide the believability of the witnesses."

Jones argues that the trial court erred in refusing to give his requested charge on motive, but his argument lacks merit. First, contrary to the underlying premise of the requested charge, it is arguable as to whether Whisby's trial testimony was favorable to the State, and "[i]f any portion of a requested charge is inapt, incorrect,

16

misleading, confusing, not adequately adjusted or tailored, or not reasonably raised by the evidence, denial of the charge request is proper."[29] However, even if Whisby's trial testimony could be construed as being favorable to the State, the court instructed the jury that it was the sole arbiter of the witnesses' credibility and that it could consider any possible motive or bias in testifying that the witnesses might have. Thus, the charge that was given adequately covered the possible motives of the State's witnesses, including those of Whisby.[30]

4. Jones also contends that the trial court erred in denying his separate requests to charge on mere presence and aiding and abetting. Once again, we disagree.

Jones requested the following charge on mere presence:

> The mere presence of a person at the scene of the commission of a crime at the time of its perpetration, without more, will not authorize a jury to find the person who was merely present guilty of consent in, and concurrence in, the commission of the crime, unless the evidence

---

[29] *Gresham v. State*, 303 Ga. App. 682, 688 (3) (695 SE2d 73) (2010) (punctuation omitted).

[30] *See Lee v. State*, 281 Ga. 776, 777-78 (3) (642 SE2d 835) (2007) (holding that the trial court's instruction that the jury was the arbiter of witness credibility and that it should give consideration to motives, adequately covered possible motive or bias of State's witnesses); *Windhom v. State*, 315 Ga. App. 855, 861 (3) (b) (729 SE2d 25) (2012) (holding that court's charge on credibility of witnesses adequately covered principles in defendant's requested charge on motive).

17

shows, beyond a reasonable doubt, that such person committed the alleged crime, helped in the actual perpetration of the crime, or participated in the criminal endeavor. [cit.] Presence at the scene of the crime, even when coupled with knowledge and approval not amounting to encouragement, is not sufficient to show that a defendant is a party to a crime.

He also requested the following charge on aiding and abetting: "The mere presence of a defendant where a crime is being committed even coupled with knowledge by the defendant that a crime is being committed or the mere acquiescence by a defendant in the criminal conduct of others even with guilty knowledge is not sufficient to establish aiding and abetting."

On appeal, Jones argues that the trial court should have given the foregoing charges to show that he should not be found guilty just because he knew Adams, Whisby, and Iwo, or because he was present near the scene of the shooting. But although the trial court did not use the exact language requested by Jones, it nevertheless instructed the jury on grave suspicion, mere association, mere presence, party to a crime, and knowledge of a crime. Accordingly, the trial court's charges

more than substantially and adequately covered the principles contained in Jones's requested charges.[31]

5. Finally, Jones argues that the trial court erred in denying his pre-trial motion to sever his trial from that of his co-defendant, Iwo. This contention likewise lacks merit.

We first note that the decision whether to grant or deny a motion to sever is "within the discretion of the trial court,"[32] and

> [i]n exercising its discretion the trial court should consider the following three factors: (1) whether the number of defendants will create confusion of the law and evidence applicable to each defendant; (2) whether there is a danger that evidence admissible against one defendant will be considered against another despite cautionary instructions to the contrary; and, (3) whether the defenses of the co-defendants are antagonistic to each other.[33]

---

[31] *See Windhom*, 315 Ga. App. at 861 (3) (c) (holding that trial court's instruction on mere presence, parties to a crime, knowledge of a crime, guilt by mere association, and grave suspicion substantially and adequately covered the principles in defendant's requested aiding and abetting charge).

[32] *Daniels v. State*, 306 Ga. App. 577, 584 (5) (703 SE2d 41) (2010) (punctuation omitted).

[33] *Id.* (punctuation omitted).

19

Furthermore, the burden is on the defendant requesting the severance to do more than "raise the possibility that a separate trial would give him a better chance of acquittal."[34] Indeed, to prevail on a motion to sever, the defendant "must make a clear showing of prejudice and a consequent denial of due process."[35]

And here, the number of defendants (two) was small enough so that the danger of confusion was minimal, especially as both Jones and Iwo were charged with jointly participating in the same offenses and as the offenses were committed as part of the same crime scheme, *i.e.*, shooting at the victims' SUV.[36] In addition, both Jones and Iwo simply denied participating in the shooting in any manner,[37] and therefore, their defenses were not antagonistic to one another.[38] Thus, as Jones fails to point to any

---

[34] *Id.* (punctuation omitted).

[35] *Id.* (punctuation omitted).

[36] *See Lankford v. State*, 295 Ga. App. 590, 592 (1) (672 SE2d 534) (2009) (holding that trial court did not err in denying defendant's motion to sever when number of defendants was sufficiently small as to minimize the danger of confusion, and all defendants were charged with jointly participating in the same offenses).

[37] Neither Jones nor Iwo testified in their own behalf at trial. Nevertheless, the focus of their respective defenses, as indicated by the testimony of several of the defense witnesses, was that while they may have been in the vicinity of the nightclub, they were not involved in the shooting.

[38] *See Daniels*, 306 Ga. App. at 585 (5) (noting that defendants' defenses were not antagonistic when one claimed to have been dropped off before the car-jacking

20

testimony or other evidence introduced at the joint trial he received that "could not have been introduced against him in a separate trial, he has failed to meet his burden of showing harm."[39] Accordingly, the trial court did not abuse its discretion in denying Jones's motion to sever.

For all the foregoing reasons, we affirm Jones's convictions.

*Judgment affirmed. Ellington, C. J., and Phipps, P. J., concur.*

---

occurred, and the other claimed to have been asleep in another co-defendant's vehicle at the time and, thus, was unaware that a crime had occurred).

[39] *Id.* (punctuation omitted).