**FIRST DIVISION
BARNES, P. J.,
GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**March 10, 2022**

# In the Court of Appeals of Georgia

A21A1481. FULLER v. THE STATE.

GOBEIL, Judge.

A jury found Henry Fuller guilty of multiple crimes related to an armed robbery committed at a Circle K convenience store in January 2016. He was indicted and tried alongside two co-conspirators, Jamario Hill and Robert Pabon. Fuller appeals from his judgment of conviction and the denial of his motion for new trial, asserting: (1) the evidence was insufficient to support the verdict, and (2) (a) the trial court committed plain error in cutting off Fuller's counsel from cross-examining co-conspirator Pabon, or (b) counsel was ineffective for failing to object to the trial court's ruling on this issue.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that in the early morning hours of January 22, 2016, the victim was working as a clerk at a Circle K convenience store in Glynn County, Georgia. The victim stepped outside to smoke a cigarette and saw two black males approaching her. The men forced the victim back into the store with a gun to her back and demanded money from the safe. The victim was not able to access the safe, so the assailants took approximately $40 to $50 from the cash register and a carton of cigarettes. The men ordered the victim to strip, took her outside behind the store, instructed her to lie on the ground, and told her that if she moved, they would shoot her. They then ran away, got into a vehicle, and the car sped away "towards Habersham [Street]." The victim heard police sirens "immediately" thereafter, and she jumped up and ran back into the store. The victim testified that she could not see the men's faces, as they were covered by masks. The incident was recorded on Circle K surveillance cameras and played for the jury.

Sergeant Jason Dixon with the Glynn County Police Department was on patrol that morning on Habersham Street and noticed a silver sedan that was moving in an unusual manner. The sedan ran a red light, and Dixon activated his emergency lights

---

[1] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

and followed the vehicle. The vehicle sped away and eventually crashed into a tree. By the time Dixon reached the vehicle, there were no occupants inside. Dixon ran the plates on the vehicle, a silver Toyota Camry, which showed the car had been reported stolen. The car was towed back to the police station, where it was impounded, searched, and processed. Fingerprints matching Fuller, Hill, and Pabon, among others, were found. DNA material matching Fuller and Hill was also found inside the vehicle.

A cell phone was found inside the vehicle. After obtaining a warrant to search the phone, Detective Resden Talbert came to believe the phone belonged to "Robbie" Pabon. Text history from the phone included an outgoing text message stating "I need a lick real bad," "lick" referring to a robbery or theft. Talbert also followed up on a tip that some of Pabon's belongings would be found at a residence, and at that residence Talbert discovered and seized boots and clothes similar to those worn by the Circle K robbers.

Investigator David Moore responded to the Circle K after the robbery was reported. After receiving the information about the fingerprints found in the silver sedan, Moore went to Hill's residence to question him. The woman who owned the home was present, gave Moore permission to search the house, and gave Moore a cell

phone belonging to Hill. After searching the phone, Moore found incriminating videos and photos of Pabon depicting him with a gun and wearing clothing similar to the Circle K robbers. Moore also pulled additional security video from the Circle K surveillance cameras, which showed two individuals matching the description of the robbers in the Circle K the day before the robbery, January 21, 2016. In the January 21 video, the faces of the individuals were visible.

Additionally, on January 20, two days before the robbery, another victim, C. A., reported her silver Toyota Camry as stolen. She testified that she did not know Pabon, Hill, or Fuller; they did not have any reason to be inside her car, and she had never authorized anyone to drive her vehicle. The next day, Marlon James, who salvages cars, received a call from a phone number later connected to Hill. When James returned the call, a man sought to sell James a "junk car[,]" specifically a 2015 or 2016 Toyota Camry. The man also sent James photos of the car. When the man stated that he did not have the car's title, James told him that he could not purchase the vehicle. The man on the phone eventually told James that "[t]he car was hot out of Jacksonville[,]" "hot" meaning stolen. The Toyota Camry connected to the Circle K robbery had a license plate matching the stolen vehicle, and Detective Moore later found photos on Hill's phone matching those sent to James.

4

Hill, Pabon, and Fuller were all arrested and indicted for the armed robbery, as well as conspiracy to commit armed robbery, aggravated assault with intent to rob, kidnapping, and false imprisonment, all related to the robbery of the Circle K. The three men also were indicted for theft by receiving stolen property related to the theft of the Toyota Camry. Fuller was indicted for possession of a weapon during the commission of a felony.[2]

The three men were to be tried jointly. After the State rested its case, Pabon decided to enter a guilty plea, agreeing to a sentence of 25 years, with 10 years to serve in confinement. While entering his plea, outside the presence of the jury, Pabon announced without prompting "I did want to state something for the record. Henry Fuller was not with me at the time." Pabon then stated his reluctance to testify, and his counsel stated that Pabon intended to exercise his right to remain silent.

Counsel for Hill called Pabon as a witness. Even though Pabon's counsel repeated that Pabon intended to remain silent, Pabon answered questions asked by Hill's counsel, replying that Hill was not with Pabon during the robbery and that Hill was not the getaway driver.

---

[2] Fuller was also indicted for possession of a firearm by a convicted felon, but the State dismissed the charge after the trial.

Counsel for Fuller then sought to question Pabon. Pabon was given a brief recess to consult with his attorney, and when he returned, Pabon's attorney announced that Pabon would assert his right to remain silent and answer no more questions. After some further discussion between the attorneys and the court, counsel for Fuller asked the trial court, "With that, Judge, I'm prohibited from continuing to question this witness?" The court responded: "I would think that would stop it." The court then instructed Pabon to leave the witness stand.

The case was submitted to the jury. The jury could not reach a unanimous verdict as to Hill, but was able to reach a unanimous verdict as to Fuller. The trial court directed the jury to continue to deliberate as to the charges against Hill, and after they were still unable to reach a unanimous verdict, the court declared a mistrial for Hill, and the jury submitted its verdict for Fuller, guilty on all counts. Fuller was sentenced as a recidivist to life plus five years. Fuller filed a motion for new trial, which was denied after a hearing. This appeal followed.

1. (a) On appeal, Fuller first contends that the evidence was insufficient "to show that Mr. Fuller committed any of the crimes alleged in this case." He argues that the evidence was solely circumstantial, and failed to exclude reasonable hypotheses of his innocence. We disagree.

6

"[W]hen a criminal conviction is appealed, the evidence must be viewed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence." *Jones v. State*, 318 Ga. App. 26, 28-29 (1) (733 SE2d 72) (2012). "[I]n evaluating the sufficiency of the evidence, we do not weigh the evidence or determine witness credibility, but only determine whether a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt." Id. at 29 (1) (citation and punctuation omitted).

We agree with Fuller that the State's case was in large part, if not entirely, based on circumstantial evidence. Where the evidence against a defendant is merely circumstantial, "the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, circumstantial evidence can support a conviction, as

> not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable. The reasonableness of an alternative hypothesis raised by a defendant is a question principally for the jury, and when the jury is authorized to find that the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis save

7

that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law.

*Blackshear v. State*, 309 Ga. 479, 483 (847 SE2d 317) (2020) (citation and punctuation omitted).

Here, we conclude that a rational juror could find Fuller guilty of the armed robbery and associated crimes. Fingerprint and DNA evidence placed Fuller and his co-defendants inside the stolen Toyota Camry. Specifically, Fuller's fingerprints were found on the exterior of the driver door, the gas cap cover, a water bottle found inside the vehicle, and the passenger door handle. Fuller's DNA was found on the gear shift and the steering wheel. Pabon's fingerprints were found on a passenger-side door and a CD recovered from the vehicle. Hill's fingerprints were also found on the water bottle alongside Fuller's, as well as driver-side and passenger-side doors and the CD. Hill's DNA was found on the gear shift and steering wheel as well.

Additionally, the owner of the vehicle testified that she did not know Fuller and the co-defendants and never provided them access to her car, showing that there was no innocent explanation for Fuller's fingerprints and DNA to be found on and inside the vehicle, including on the gas cap, steering wheel, and gearshift. Sergeant Dixon witnessed this vehicle in the area of the Circle K just after the robbery, and observed

8

the vehicle flee after he turned on his emergency lights, before it crashed into a tree. Additionally, evidence connected the three defendants to each other and to the robbery itself, including clothing found at a residence where Pabon stayed which matched the clothing seen in the videos from the Circle K surveillance cameras. And, as described above, the three defendants' fingerprints and DNA were intermingled inside the vehicle, including on specific objects.

The jury also was able to view the Circle K surveillance footage from the robbery and from January 21, the day before the robbery. The jurors were able to assess whether these individuals wore similar clothing and matched the general size and description of the robbers. In the January 21 footage, the mens' faces were in view, and the jury was able to decide whether those men resembled the robbers and the defendants inside the courtroom. See *Grimes v. State*, 291 Ga. App. 585, 590-591, 594 (2) (662 SE2d 346) (2008) (identifying a suspect from a surveillance video is within the province of the jury).

Ultimately, where the jury heard the State's evidence linking Fuller to the stolen vehicle and the Circle K robbery, and where they heard Fuller's counsel's argument that the State had not sufficiently identified the men inside the Circle K, we cannot say that the jurors irrationally chose to convict Fuller of the indicted offenses.

See *Moon v. State*, 187 Ga. App. 558, 558-559 (370 SE2d 808) (1988) (affirming burglary conviction based on circumstantial evidence where defendant's fingerprints were found on window through which entry was gained into residence, and where there was no innocent explanation presented as to how they came to be there); *Perdomo v. State*, 307 Ga. 670, 673-674 (2) (837 SE2d 762) (2020) (affirming convictions where suspects were not positively identified but "the jury heard detailed testimony concerning a trio of armed and masked men committing the crimes" charged, defendant's fingerprints were found on (and he admitted to being inside) the vehicle seen at the scene of the crimes, and "the overwhelming evidence demonstrated that all occupants of the vehicle were involved in the crimes in question").

(b) Fuller specifically contests his kidnapping conviction, arguing that the State failed to prove asportation. We are unpersuaded. Generally, to prove the offense of kidnapping, the State must prove that the victim was moved. OCGA § 16-5-40 (a). OCGA § 16-5-40 (b) (1) provides that even slight movement satisfies the asportation requirement so long as the movement is not merely incidental to the commission of some other offense. Movement of the victim is not considered merely incidental to another offense if it: (a) conceals or isolates the victim, (b) makes the commission of

10

the other offense substantially easier, (c) lessens the risk of detection, or (d) is for the purposes of avoiding apprehension. OCGA § 16-5-40 (b) (2) (A)-(D).

In this case, after the robbery was committed, the victim was forced to strip and moved outside behind the store, where she was ordered to lie down while the robbers made their getaway. This movement concealed her from the view of anyone looking into the store, isolated her from others, and lessened the risk of the robbers being detected or apprehended as they fled. We find this evidence sufficient to prove the asportation element of kidnapping. See *Alexander v. State*, 348 Ga. App. 859, 865 (1) (b) (825 SE2d 405) (2019) (moving robbery victim into a bathroom satisfied the asportation element by isolating victim, concealing victim, and making the robbery substantially easier); *Taylor v. State*, 344 Ga. App. 122, 131 (1) (g) (809 SE2d 76) (2017) (moving victim from doorway into interior room satisfied asportation element because it "concealed and isolated [the victim] from anyone who would have happened by the door to the apartment at the time" and also reduced the likelihood that the robbery would be detected).

(c) Fuller also specifically contests his theft by receiving stolen property conviction, arguing that the State failed to prove that Fuller knew the vehicle was stolen. Again, we are unpersuaded. Under OCGA § 16-8-7 (a), a person commits the

11

offense of theft by receiving "when he receives, disposes of, or retains stolen property which he *knows or should know was stolen*[.]" (Emphasis supplied.)

Fuller was indicted individually and as a party to this crime. "A passenger in a stolen vehicle may be convicted of theft by receiving if other circumstances exist from which guilty knowledge may be inferred, such as some evidence, either direct or circumstantial that the accused was a party to the crime by aiding and abetting its commission." *King v. State*, 268 Ga. App. 811, 812 (1) (603 SE2d 88) (2004). Evidence in this case showed that the vehicle was stolen on January 20, a mere two days before the robbery. In that short time frame, Fuller left his fingerprints on the outside and inside of the car, and left his DNA on the steering wheel and gear shift, demonstrating his possession and control of the vehicle. The vehicle's owner testified that she did not know Fuller and his co-defendants, and there was no innocent explanation for Fuller's fingerprints and DNA being found outside or inside the vehicle.

There was evidence implying knowledge that the vehicle was stolen, including a cell phone linked to Hill that was used to called a car salvager, and evidence that the man who made the call tried to sell the vehicle, admitting that he did not have the car's title, and describing the car as "hot." Additionally, the car had a Florida license

plate with a plate frame from the victim's church, and adult diapers were found in the car's trunk that belonged to an elderly patient of the victim's. These unusual details allowed the jury to infer that Fuller had knowledge that this car did not belong to any of the young men with whom he was driving the car around Glynn County, Georgia. See *King*, 268 Ga. App. at 812 (1) (it was obvious that a truck the defendant was riding in was stolen because "the ignition was messed up") (punctuation omitted); *Sanders v. State*, 204 Ga. App. 545, 546 (1) (a) (419 SE2d 759) (1992) (personal items of the victims, including photographs and items containing their names, were strewn about the interior of the car, putting the defendant on notice that his accomplice did not own the car). Therefore, we affirm the trial court's denial of Fuller's motion for new trial based on the sufficiency of the evidence.

2. Fuller also raises error associated with the trial court's ruling that he could not continue to cross-examine Pabon.

(a) First, Fuller asserts that the trial court committed plain error when it cut off his questioning of Pabon after Pabon communicated his desire to assert his Fifth Amendment right to remain silent. For the reasons that follow, we do not find plain error.

13

Fuller argues that he was entitled to a full and sifting cross-examination of Pabon after he was called as a witness by Hill. He contends that the error affected the outcome of his trial because Pabon "was the only witness who took the stand offering testimony about who was and was not actually involved in the armed robbery of the Circle K." He argues that allowing Hill to elicit testimony from Pabon that Hill was not present at the robbery, but preventing Fuller from seeking the same kind of testimony from Pabon in his favor, explains the discrepancy in the verdicts between Hill (mistrial) and Fuller (guilty).

Fuller is correct that a defendant has the right to a "thorough and sifting cross-examination" and that "[c]ross-examination is a vital component of the constitutionally protected right of the accused to confront the witnesses against him." *Snelling v. State*, 215 Ga. App. 263, 264 (1) (a) (450 SE2d 299) (1994). However, because the record reveals that Fuller's counsel made no objection to her inability to further cross-examine Pabon or further confront Pabon on behalf of Fuller, we agree that the correct standard to apply on review is plain error. See *Simpson v. State*, 353 Ga. App. 568, 571 (2) (839 SE2d 47) (2020) (where defendant did not raise Confrontation Clause argument at trial, we review only for plain error).

14

> To show plain error, [Fuller] must show that the error: (1) was not affirmatively waived; (2) was clear and not open to reasonable dispute; (3) affected his substantial rights; and (4) seriously affected the fairness, integrity, or public reputation of judicial proceedings. Under the third prong of this test, [Fuller] must make an affirmative showing that the error probably did affect the outcome below. Satisfying all four prongs of this standard is difficult, as it should be.

Id. (citation and punctuation omitted).

In this case, the trial court conceded in its order on Fuller's motion for new trial that it committed error by allowing Pabon to assert his Fifth Amendment right to remain silent without examining whether his testimony may have subjected him to prosecution for some other offense. And we agree.

Although Pabon had pleaded guilty, he had not yet been sentenced, so he likely was entitled to assert his Fifth Amendment right to remain silent. See *Shealey v. State*, 308 Ga. 847, 852 (2) (b) (843 SE2d 864) (2020) (citing *Mitchell v. United States*, 526 U. S. 314, 326 (119 SCt 1307, 143 LE2d 424) (1999), for the proposition that "a defendant's Fifth Amendment privilege against self-incrimination is not extinguished by the entry of a guilty plea but rather may be asserted at least until sentencing"). "When the witness manifests his intention to claim Fifth Amendment protection, the court must conduct a hearing outside the presence of the jury to determine whether

15

the testimony the State seeks to elicit potentially could incriminate the witness." *Parrott v. State*, 206 Ga. App. 829, 832 (2) (427 SE2d 276) (1992). See also *Brown v. State*, 295 Ga. 804, 809 (5) (a) (764 SE2d 376) (2014) (same process applied when a criminal defendant intended to call witness). It is clear that the court failed to conduct such an inquiry in Fuller's case.

However, we cannot conclude that the error in this case probably did affect the outcome below. Although Pabon should not have been excused from the witness stand without further inquiry, it is clear from the record that he did not want to answer further questions from Fuller's counsel. Pabon's attorney was continuously advising Pabon to remain silent, and Pabon repeated multiple times that he did not intend to answer any more questions. "[A]n unanswered question does not furnish grounds for a mistrial." *Willard v. State*, 244 Ga. App. 469, 472 (1) (b) (535 SE2d 820) (2000) (citation and punctuation omitted). Instead, "(w)hen a witness declines to answer on cross examination certain pertinent questions relevant to a matter testified about by the witness on direct examination, all of the witness' testimony on the same subject matter should be stricken." *Mercer v. State*, 289 Ga. App. 606, 608-609 (2) (658 SE2d 173) (2008) (citation, punctuation, and emphasis omitted). See also *Cody v. State*, 278 Ga. 779, 780-781 (2) (609 SE2d 320) (2004) ("If the witness's refusal to

16

answer (whether because the answer could incriminate or because the witness violates the court's order to answer) denies a party a thorough and sifting cross-examination of the specifics of the witness's testimony on direct, then the trial court is authorized to strike that witness's direct testimony."). Therefore, had the court followed the proper procedure, Fuller would still not have been entitled to the testimony he desired from Pabon; he would have been entitled merely to striking Pabon's testimony that Hill was not with him during the robbery. See *Mable v. State*, 261 Ga. 379, 381 (2) (405 SE2d 48) (1991) (failure to strike testimony of witness was harmless, where evidence of guilt was overwhelming). Thus, we cannot find plain error in this case.

(b) Alternatively, Fuller asserts that trial counsel was ineffective for failing to object when the trial court allowed Pabon to be excused as a witness; and in so failing, thereby "acquiesced to the trial court's erroneous decision." We disagree.

To prevail on a claim of ineffective assistance of counsel, Fuller must prove both that his lawyer's performance was deficient and that he suffered prejudice as a result of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "If [Fuller] cannot meet his burden of proving either prong of the *Strickland* test, then we need not examine the other prong." *Causey v. State*, 319 Ga. App. 841, 842 (738 SE2d 672) (2013). "The trial

17

court's determination that an accused has not been denied effective assistance of counsel will be affirmed on appeal unless that determination is clearly erroneous." *Johnson v. State*, 214 Ga. App. 77, 78 (1) (447 SE2d 74) (1994) (citations and punctuation omitted).

Pretermitting whether trial counsel's failure to object constitutes deficient performance, we agree with the trial court that Fuller cannot demonstrate that he was prejudiced by counsel's actions. As discussed above, even had counsel successfully objected to Pabon's refusal to answer her questions, the proper remedy would have been to strike his previous testimony about who was with Pabon during the robbery. *Mercer*, 289 Ga. App. at 608-609 (2). None of Pabon's testimony was incriminating as to Fuller, so striking it was not likely to have changed the result of Fuller's trial.

*Judgment affirmed. Barnes, P. J., and Markle, J., concur*.