## A04A1479. REYNOLDS v. THE STATE.
(603 SE2d 779)

SMITH, Chief Judge.

Willie Reynolds was indicted by a Brooks County grand jury on charges of rape, incest, and false imprisonment. A jury found him guilty as charged, he was sentenced, and his motion for an out-of-time appeal was granted. He appeals, raising the general grounds and alleging that his trial counsel provided ineffective assistance of counsel. We find no merit in either enumeration, and we affirm the judgment.

1. We first consider whether the evidence was sufficient to authorize the jury to find Reynolds guilty. On appeal, the evidence is viewed in the light most favorable to the jury's verdict, and the defendant no longer enjoys a presumption of innocence. This court cannot weigh the evidence or judge witness credibility; we determine only whether the evidence is sufficient under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). *Mallon v. State*, 253 Ga. App. 51, 53 (3) (557 SE2d 409) (2001).

So viewed, the evidence presented at trial showed that Reynolds's family attended a family gathering at the home of his wife's mother. Reynolds's wife and her mother went to a neighbor's home to play cards, and Reynolds took his four stepdaughters home to feed them and get them ready for bed. After the children had been fed and bathed, the younger children settled in the living room to watch television. Reynolds's 11-year-old stepdaughter did not want to watch the program her younger siblings were watching, and Reynolds gave her permission to watch television in her mother's bedroom. Reynolds then took a bath himself, and wearing only his shorts, he entered the bedroom. When he locked both bedroom doors, the victim tried to leave the room because she "had a funny feeling," but Reynolds would not let her leave. Reynolds asked his stepdaughter to perform oral sex, and she declined. He then forcibly managed to get her clothes off, and raped her on the bed. When the victim told him to stop, he said "no, relax." The victim testified that he penetrated her and it hurt, "like somebody was punching me." Reynolds told the victim not to tell

anyone what had happened. After Reynolds ejaculated, the victim cleaned herself in the bathroom.

Reynolds's wife returned home shortly thereafter, but her daughter did not inform her of the rape until the next morning, after Reynolds had left for work. At that time, she told her mother, who immediately confronted her husband at work because she did not doubt her daughter and wanted to see her husband's reaction. When her husband denied that anything happened, she "went straight to the Brooks County Hospital, where the nurses contacted DFACS, the G.B.I. and the sheriff's office."

A DFACS supervisor testified that she interviewed the victim at the hospital emergency room. She testified that the victim told her that her stepfather had forcibly raped her and that it hurt. The victim also told her that after the rape she was bleeding, and she put on a sanitary napkin. A nurse practitioner who had special training and experience in sexual assault examinations testified that she performed a sexual assault examination on the victim after taking the victim's history. The witness testified that she performed the examination and preserved the evidence collected according to G.B.I. protocol. She testified that she observed "what appeared to be petechia or bruising on [the victim's] cervix" in three areas. She also noted some blood in her cervix, and identified a photograph taken at the hospital in which the victim was "oozing blood." Based upon her experience and training, the nurse practitioner concluded that "there was trauma to her cervix . . . that could be consistent with intercourse." After drying and packaging the swabs and other evidence she had collected, she sealed them in individual envelopes, placed the envelopes in a bag, sealed the bag, and gave it to a Quitman police sergeant who was present at the hospital during the examination. The sergeant testified that she received the evidence from the nurse practitioner, logged it in to an evidence log, and turned it over to the agent in charge of the case.

The former G.B.I. agent in charge of the case testified that he interviewed Reynolds when he was arrested, and that Reynolds denied that anything had happened. The agent was present when Reynolds's blood was drawn, and he packaged it properly and delivered it, along with the other evidence given to him by the Quitman Police Sergeant, to Moultrie, where it was transported to the G.B.I. Crime Lab in Atlanta.

A forensic biologist at the G.B.I. Crime Lab testified that she analyzed the rape kit submitted to her in this case. Examining the slides made from the swabbings taken from the victim, she tested them for sperm, and they tested positive. She then analyzed the blood sample from Reynolds for DNA, and compared that to the DNA found on the slides made from the swabs of the victim's vagina and cervix.

She concluded from the comparison that the DNA on the swabs matched the DNA in Reynolds's blood sample. In the forensic biologist's opinion, such a match "would occur in one and one quadrillion people in the African American population and one in forty quadrillion in the Caucasian population." The biologist concluded that her testing had answered the questions presented to her, which were whether sperm was present in the swabbings from the victim, and where it came from.

Reynolds testified in his own defense and denied any knowledge of how his semen came to be located in the victim's vagina, but the testimony of the victim alone was sufficient to authorize the jury to find Reynolds guilty of the charged crimes. *Lowe v. State*, 259 Ga. App. 674, 675 (1) (578 SE2d 284) (2003); see also *Gibbs v. State*, 256 Ga. App. 559, 560 (568 SE2d 850) (2002).

(a) OCGA § 16-6-1 (a) (1) provides that one "commits the offense of rape when he has carnal knowledge of . . . [a] female forcibly and against her will." The victim testified that Reynolds penetrated her forcibly and against her will, which satisfies the necessary elements in the statute. In addition, DNA evidence confirmed that Reynolds's semen was in the victim's vagina and cervix, and medical evidence showed bruising consistent with intercourse. The evidence was more than sufficient to authorize the jury to find Reynolds guilty of rape.

(b) OCGA § 16-6-22 (a) (1) provides that one "commits the offense of incest when he engages in sexual intercourse with a person to whom he knows he is related either by blood or by marriage as follows: . . . [f]ather and daughter or stepdaughter." It is undisputed that the victim is Reynolds's stepdaughter. Given that the State established that Reynolds had sexual intercourse with the victim, the jury was authorized to find him guilty of incest. *Walker v. State*, 234 Ga. App. 40, 41 (2) (506 SE2d 179) (1998).

(c) The jury's finding that Reynolds was guilty of false imprisonment was also supported by sufficient evidence. "The essential elements of the crime of false imprisonment are: violating the personal liberty of another, by arresting, confining or detaining a person, without legal authority. OCGA § 16-5-41 (a)." *Laredo v. State*, 253 Ga. App. 155, 157 (1) (558 SE2d 742) (2002). Here, as in *Laredo*, the rape victim testified that she tried to leave, but the rapist would not permit her to do so. Here, as in *Laredo*, the evidence was sufficient to authorize the jury to find that the defendant "deprived the victim of personal liberty by confining and detaining her without legal authority to do so." (Citation and footnote omitted.) Id.

2. Reynolds contends that his trial counsel provided ineffective assistance of counsel because he failed to object to "numerous leading questions propounded by [the] State," citing over 60 instances of such questions, which constitute a major portion of his brief on appeal.

To establish ineffectiveness, a defendant must prove that trial counsel's performance was deficient and but for the deficiency a reasonable probability existed that the result of the trial would have been different. An error by counsel, even if professionally unreasonable, does not warrant reversal of a criminal conviction if it had no effect on the judgment.

(Citation omitted.) *Smith v. State*, 261 Ga. App. 871, 876 (5) (583 SE2d 914) (2003). In *Smith*, we held that trial counsel was not ineffective by failing to object to "excessive" leading questions, because "[d]ecisions as to whether to interpose certain objections fall within the realm of trial tactics and strategy and usually provide no basis for reversal of a conviction [cit.]," nor do they amount to ineffective assistance of counsel. Id. at 876-877 (5) (a). Also, it appears here that a majority of the leading questions were asked to establish routine points, the answers to which were either obvious or answered by other witnesses. For example, the State asked the Quitman Police Sergeant: "Your duties were mainly to transport [the evidence]?" and "did you make what is commonly referred to as a crime scene diagram?" And the State asked Reynolds's wife what time she arrived home, when it had not yet been established that she came home.

Finally, even if failure to object to these routine leading questions rendered trial counsel's representation ineffective, Reynolds has not demonstrated how this failure prejudiced his case to the extent that a reasonable probability exists that but for the leading questions the outcome of the trial would have been different. The evidence in this case — the victim's own testimony, consistent testimony regarding her outcry, the physical examination results, and the DNA evidence — was overwhelming.[1] Here, as in *Smith*, supra, 261 Ga. App. at 877 (5) (a), Reynolds did not show that the jury would have reached a different verdict but for the leading questions.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED AUGUST 26, 2004.

*Ronald L. Beckstrom*, for appellant.
*J. David Miller, District Attorney, Justo C. Cabral III, Assistant District Attorney*, for appellee.

---

[1] The jury had no difficulty reaching its guilty verdicts, returning in only 15 minutes.