**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY and SELF, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**January 25, 2018**

# In the Court of Appeals of Georgia

A17A1608. ROBERTS v. THE STATE.

DILLARD, Chief Judge.

Following trial in the Superior Court of DeKalb County, a jury convicted Santee Roberts of one count of violating the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO"), one count of identity fraud, one count of financial-transaction-card fraud, and two counts of exploitation of an elder person. On appeal, Roberts challenges the sufficiency of the evidence supporting her convictions and further argues that the trial court erred in denying her motion to prohibit news media from taking still photographs in the courtroom during trial, admitting into evidence earlier indictments and her guilty pleas to similar crimes in the Superior Court of Fulton County, and denying her claims of ineffective assistance of counsel. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that throughout the spring and summer of 2009, dozens of senior citizens living in DeKalb and Fulton Counties received telephone calls, in which a female claiming to be a representative of Georgia Power Company named Tonya McCloud would inform them that their utility bill had not been paid and that their power would be cut off if they did not provide her with credit card, bank account, or other personal and financial information. Many of these victims complied with the caller's request, which then resulted in their credit cards or ATM cards being used without their permission to make purchases or obtain cash. For instance, in May of 2009, 65 year-old M. C. received a phone call from a woman who claimed to be a representative of Georgia Power and informed her that her power was going to be turned off because of her failure to make payments on her bill. The caller then explained that M. C. could avoid disruption in service if she provided her credit-card information. M. C. complied, but later, she determined that she had been targeted by someone engaging in fraud. And indeed, after contacting her credit-card company, she learned that her card had been used for numerous purchases and cash advances totaling nearly $8,000.

---

[1] *See, e.g.*, *Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

2

In a similar incident, around noon on Saturday, July 4, 2009, 76 year-old E. K. was preparing food for a Fourth of July party when she received a telephone call from a woman who identified herself as Tonya McCloud, an employee with the Georgia Power Company. The caller told E. K. that her power bill had not been paid and claimed that she needed to provide personal information, checking-account information, and a credit-card account number if she wanted to avoid having her power cut off. Worried about her ill husband who would not fare well without air-conditioning, E. K. provided the information as requested. Later that evening, the purported Ms. McCloud called again and this time connected E. K. with a man who claimed to be a representative of Bank of America, confirmed that E. K.'s most recent payment to Georgia Power had not cleared, and told her that this man would assist her in making payment on the Georgia Power account if she placed a credit card in her mailbox, where it could be retrieved by a bank representative. E. K. again complied. Within a few minutes of doing so, she observed a vehicle park near her mailbox, at which point a tall male she did not recognize retrieved her credit card and left. Shortly thereafter, E. K. concluded that she had probably been the victim of a scam. Consequently, on Monday morning, she called her bank to report the incident and

3

learned that over the weekend her credit card had been used to make purchases at several gas stations, restaurants, and grocery stores.

Later that same month, 79 year-old B. W. received a phone call and noticed that the caller identification feature on her phone indicated that the caller was "Georgia Power." When B. W. answered the phone, the caller told her that there had been a problem with her last payment for her power bill and that she would have to repay the amount due immediately to avoid having her service disrupted. The caller then instructed B. W. to place her credit card and bank ATM card in an envelope, and an employee would arrive shortly to take the envelope to the local office to make payment on her behalf. B. W. did as directed, and a short time later, a young man came to her door, asked for the envelope, and left in a vehicle that was parked on the street. That same afternoon, B. W.'s bank called to advise that her card had been used to make suspicious purchases.

All told, over the course of the spring and summer of 2009, approximately 71 victims, including 35 victims in DeKalb County, reported being targeted by the perpetrators of this Georgia Power ruse. And based on the victims' subsequent reporting of these incidents, as early as the spring of 2009, a supervisor of security for Georgia Power and the Clayton and Fulton County Police Departments initiated

4

investigations. These investigations eventually lead them to a motel room off of Fulton Industrial Boulevard, and on April 28, 2009, officers knocked on the door of Room 159 of the motel and encountered a woman who identified herself as Nadine Simmons but claimed to not have any identification. After running the woman's name and birth date through their computer system and determining that no such person existed, the officers again asked the woman to provide identification, and again, she claimed she could not do so. Consequently, the officers arrested the woman, and during a safety sweep of the motel room, they recovered several credit cards bearing the names of different people and an identification card that had the woman's photograph but a different name than the one she had provided.

Following the arrest, the officers transported the woman to the local police precinct to interview her. And after conducting some research, the lead detective investigating the case determined that the woman's true identity was Santee Roberts. But before she could be interviewed, Roberts began complaining that she felt ill and needed medical attention. Thus, the detective called emergency medical personnel, who decided to transport Roberts to the hospital for treatment. After finishing some paperwork, the detective prepared to follow the ambulance to the hospital but was stopped by a female officer, who told him that she had just been in the women's

restroom and had found dozens of credit cards and bank cards bearing various names stuffed into the toilet-seat-cover dispenser in one of the restroom's stalls. Knowing that Roberts had been the only female arrestee allowed to use the restroom that day, the detective collected this additional evidence and proceeded to the hospital. There, Roberts confirmed her true identity, and the detective issued several citations to her, which included notice that she was to appear in court on May 20, 2009, to answer the charges. But Roberts failed to appear, and almost immediately, reports resumed from senior citizens claiming that a female Georgia Power representative had called them, requesting credit card and other financial information.

For the next few months, the detective and the Georgia Power security supervisor attempted to track down Roberts, but she proved to be elusive. Then, on August 14, 2009, 65 year-old F. S. was at her home in East Point, when she received a call from a female who claimed to be a representative of her gas company and informed her that her service was going to be cut off because she had failed to pay her last bill. The caller then told F. S. that this disruption could be avoided if she provided her credit-card information over the phone. But a few minutes later, a male voice came on the line and told F. S. that the transaction had not processed and that she should put her bank card in her mailbox for a representative to retrieve. F. S. told

6

the caller she would do as requested, but immediately after ending the call, she called her son and informed him about the incident, and he, in turn, called the police.

Not long thereafter, an officer with the East Point Police Department arrived at F. S.'s home and began interviewing her about the suspicious phone call. And while speaking with F. S. in her front yard, the officer noticed a white vehicle pull up to her mailbox. F. S. also noticed the vehicle and mentioned to the officer that it had driven by earlier and paused near her mailbox. Upon learning this, the officer immediately called for backup to block the streets leading in to F. S.'s neighborhood. A few minutes later, the officer returned to his patrol car and began driving around the neighborhood looking for the white vehicle. Approximately one block over from F. S.'s home, the officer spotted the vehicle parked in the driveway of another home and saw two females walk out from behind the house. Initially, the women denied being the occupants of the vehicle. But after the homeowner came outside and told the officer that he did not know the women, they admitted that they had been in the car but claimed that a man named Steve had been driving and that he had fled after parking. In response to the officer's questions, the women identified themselves as Tracy Jones and Joanne Brown, but their information did not match any persons in the GCIC database. Given these circumstances, the officer detained both of them for

further questioning. The women were then transported to the precinct, and the officer began compiling an inventory of the contents of the vehicle, which neither woman claimed to own. While doing so, the officer observed a mobile phone on the vehicle's backseat, which then began ringing. Picking the phone up, the officer realized that it was F. S.'s number that was calling. The officer answered the phone and identified himself, at which point F. S. said that she was calling the number of the person who had claimed to be the gas-company representative.

After transporting the two women to the police precinct, a detective determined that the actual identity of the younger of the two was Roberts, and the older woman was identified as Charlene Merkerson. Both women then complained of feeling ill and requested medical treatment. Thus, the police called emergency personnel, who examined both women and recommended that Merkerson be taken to the hospital, as she was exhibiting signs of high blood pressure, but stated that Roberts's vitals were normal. Upon determining Roberts's identity, the detective arrested her, but Merkerson, at some point after being transported to the emergency room, fled and was never apprehended.

Thereafter, the State charged Roberts, Merkerson, and Donald Crane,[2] via indictment, with one count of violating the Georgia Racketeer Influenced and Corrupt Organizations Act by conspiring to commit identity fraud, committing identity fraud, and committing financial-transaction-card fraud, one count of identity fraud, one count of financial-transaction-card fraud, and two counts of exploitation of an elder person. The case then proceeded to trial, during which the State presented the aforementioned evidence. Additionally, the State presented video surveillance footage of Roberts attempting to make purchases at various stores using victims' credit and bank cards. The State also presented evidence that Roberts had committed similar crimes in Michigan, which involved her posing as a utility-company representative in order to obtain victims' credit card and other financial information and, in fact, pleaded guilty to such crimes in the United States District Court for the Northern District of Michigan in 2003. Finally, as further evidence that Roberts engaged in a pattern of racketeering, the State presented recent indictments in the Superior Court of Fulton County, charging Roberts with similar crimes, and her subsequent guilty

---

[2] Crane, apparently, was the male caller on some of the phone calls made to the victims. It is unclear from the record if he was ever apprehended. Nevertheless, neither Crane nor Merkerson were tried with Roberts.

pleas to those crimes. And at the trial's conclusion, the jury convicted Roberts on all counts.

Thereafter, Roberts obtained new counsel and filed a motion for new trial, in which she argued, *inter alia*, that her trial counsel rendered ineffective assistance. Nevertheless, after a hearing on the matter, in which her trial counsel testified, the trial court denied Roberts's motion. This appeal follows.

1. We first address Roberts's rather general contention that the evidence was insufficient to support her convictions. And after consideration of this argument, we find that it lacks merit.

When a criminal conviction is appealed, the evidence must be viewed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence.[3] And, of course, in evaluating the sufficiency of the evidence, we do not "weigh the evidence or determine witness credibility, but only determine whether a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt."[4] Thus, the jury's verdict will be upheld so long as "there

[3] *See English v. State*, 301 Ga. App. 842, 842 (689 SE2d 130) (2010).

[4] *Jones v. State*, 318 Ga. App. 26, 29 (1) (733 SE2d 72) (2012) (punctuation omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case."[5] With these guiding principles in mind, we turn now to Roberts's claim of error.

Focusing first on the offenses that formed the predicate acts of the RICO violation, as well as separate counts on their own, at the time of the indictment, OCGA § 16-9-121 (a) (1) provided: "A person commits the offense of identity fraud when he or she willfully and fraudulently . . . [w]ithout authorization or consent, uses or possesses with intent to fraudulently use, identifying information concerning an individual. . . ." And "identifying information" includes checking-account numbers, credit-card numbers, and debit-card numbers.[6] In the same time frame, OCGA § 16-9-122 provided: "It shall be unlawful for any person to attempt or conspire to commit any offense prohibited by this article." Additionally, OCGA § 16-9-33 (a) (2) (B) provided:

> A person commits the offense of financial transaction card fraud when with intent to defraud the issuer; a person or organization providing

---

[5] *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001) (punctuation omitted); *accord Westbrooks v. State*, 309 Ga. App. 398, 399-400 (1) (710 SE2d 594) (2011).

[6] *See* former OCGA § 16-9-120 (4) (D), (F), (G) (2008).

money, goods, services, or anything else of value; or any other person, [she] . . . [o]btains money, goods, services, or anything else of value by . . . [p]resenting the financial transaction card without the authorization or permission of the cardholder[.]

Furthermore, under the former version of OCGA § 30-5-8,[7] "[i]n addition to any other provision of law, the abuse, neglect, or exploitation of any disabled adult or elder person shall be unlawful."[8] And former OCGA § 30-5-3 (7.1) defined "[e]lder person" as "a person 65 years of age or older who is not a resident of a long-term care facility. . . ."[9]

Turning to the RICO violation charge, at the time the indictment in this case issued,[10] OCGA § 16-14-4 (a) of the Georgia RICO Act provided: "It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." A

---

[7] *See* Ga. L. 2009, Act 147, § 2 (effective July 1, 2009).

[8] *See* former OCGA § 30-5-8 (a) (1) (2009).

[9] *See* former OCGA § 30-5-3 (7.1) (2009)

[10] In 2015, the RICO Act was amended in several minor respects, but those amendments did not become effective until July 1, 2015, and have no bearing on this appeal. *See* Ga. L. 2015, Act 98, § 2-25.

12

person participates in a "pattern of racketeering activity" when he or she engages "in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents. . . ."[11] And under that statute, the term "'[r]acketeering activity' means to commit" a number of crimes chargeable by indictment under the laws of Georgia, as delineated in OCGA § 16-14-3 (9) (A) (i) – (xxxvii), including the crimes relating to the unlawful use of financial-transaction cards and identity fraud.[12]

As previously mentioned, Count 1 of the indictment charged Roberts with violating the RICO Act by committing the overt acts of conspiracy to commit identity fraud, identity fraud, and financial-transaction-card fraud with respect to dozens of mostly elderly victims. Count 2 charged her with identity fraud, alleging that she "did

---

[11] *See* former OCGA § 16-14-3 (8) (A) (2009). We recognize that some of the acts of racketeering that the State alleged to support the RICO charge against Roberts occurred prior to the July 1, 2009 effective date of this statute. *See* Ga. L. 2008, Act 528, § 9. But the 2008 amendments to the 2006 version of OCGA § 16-14-3 were minor and have no bearing on this appeal. *Compare* Ga. L. 2006, Act 451, § 2, *with* Ga. L. 2008, Act 528, § 9.

[12] *See* former OCGA § 16-14-3 (9) (A) (xxiii), (xxxvi) (2009).

13

willfully and fraudulently, possess with intent to fraudulently use a Bank of America financial transaction card account number, identifying information concerning an individual, to wit: [B. W.], by attempting to charge $426.93 to said account number at Wal-Mart, without the authorization or consent of [B. W.]." Count 3 charged Roberts with financial-transaction-card fraud, alleging that she "with the intent to defraud Bank of America . . . did unlawfully use a financial transaction card retained with knowledge that it was retained in violation of Code Section 16-9-31 . . . for the purposes of obtaining U. S. currency, to-wit; the accused withdrew $500.00 from the account of [B. W.] at a Bank of America ATM." And Counts 4 and 5 charged her with exploitation of an elder person, B. W. and E. K., respectively, alleging that she "did willfully exploit [the victim], an elder person who is more than 65 years of age . . . by the illegal and improper use of the resources of [the victim], by calling [the victim] at her home and taking her financial transaction card from her mailbox, using false pretense, deception, and misrepresentation, for [her] own profit."

Here, as discussed in detail *supra*, the evidence showed that over the course of several months, Roberts, with Merkerson's assistance, participated in a scheme, in which she and her cohorts obtained elderly victims' credit card, banking, and other financial and personal information by telephoning the victims, while posing as utility-

14

company representatives, and informing them that their power would be cut off if they did not immediately provide such information. In several of these phone calls, including those made to B. W. and E. K., Roberts and her accomplices convinced the victims to place their credit and bank cards in their mailboxes so they could retrieve them. As a result of this skulduggery, Roberts used the cards or the account numbers to make purchases at grocery stores, gas stations, and other retail outlets, and to obtain cash advances. Given these particular circumstances, the evidence was sufficient to support Roberts's convictions on the charges of identity fraud, financial-transaction-card fraud, and of exploitation of an elder person.[13] Furthermore, because

[13] *See Marks v. State*, 280 Ga. 70, 72 (1) (a) (623 SE2d 504) (2005) (finding that defendant's use of elder person's credit card to wire more than $5,000 to defendant's relative supported his conviction for elder abuse); *Daniel v. State*, ___ Ga. App. ___, Slip op. at 4 (1) (b) (Case No. A17A0746; decided August 2, 2017) (holding that evidence that defendant stole victim's credit card and gave it to an accomplice who fraudulently used it to make a purchase at a convenience store was sufficient to support defendant's conviction for identity fraud); *Smith v. State*, 322 Ga. App. 433, 435-36 (1) (a) (745 SE2d 683) (2013) (holding that evidence the defendant and accomplice used victim's bank-account numbers without permission to make purchases at an electronics store was sufficient to support defendant's conviction for identity fraud); *Epps v. State*, 262 Ga. App. 113, 113-14 (1) (584 SE2d 701) (2003) (holding that evidence that defendant purchased items at a department store using a stolen credit-card number was sufficient to support defendant's conviction for financial-transaction-card fraud); *Rogers v. State*, 259 Ga. App. 516, 517-18 (1) (578 SE2d 169) (2003) (finding that evidence that defendant used his former brother-in-law's credit card without permission to make various purchases sufficiently supported defendant's conviction for financial-transaction-card fraud).

15

the evidence was sufficient to sustain her convictions for these predicate acts, the evidence was also sufficient to sustain Roberts's RICO conviction.[14]

2. Roberts also contends that the trial court erred in denying her motion to prohibit news media from taking still photographs in the courtroom during trial. Again, we disagree.

Rule 22 (P) of the Uniform Rules of Superior Court provides that "[a] request for installation and use of electronic recording, transmission, videotaping or motion picture or still photography of any judicial proceeding shall be evaluated pursuant to the standards set forth in OCGA § 15-1-10.1."[15] And under that Code section, when considering a request to photograph judicial proceedings, a trial court may consider, among other things, "[t]he consent or objection of the parties or witnesses whose testimony will be presented in the proceedings"; whether the "proposed coverage will promote increased . . . openness of judicial proceedings"; "[t]he impact upon the integrity and dignity of the court"; "[t]he impact on the administration of the court";

---

[14] *See Akintoye v. State*, 340 Ga. App. 777, 782 (1) (d) (798 SE2d 720) (2017) (holding that evidence the defendant committed predicate crimes was sufficient to support defendant's conviction on RICO charge based on such crimes); *Kilby v. State*, 335 Ga. App. 238, 241-42 (1) (a) (780 SE2d 411) (2015) (same).

[15] Ga. Unif. Sup. Ct. R. 22 (P).

16

and "[t]he impact upon due process and the truth finding function of the judicial proceeding."[16] Importantly, in ruling on a request for electronic and photographic coverage of judicial proceedings, a trial court should "bear in mind this State's policy favoring open judicial proceedings."[17]

Here, during a hearing just prior to the start of her trial, Roberts moved to prohibit a local news organization from setting up a camera and microphones in the courtroom. Roberts argued generally that she believed cameras would have an adverse impact on the court. She also maintained that cameras would impact her due-process rights, claiming that she had been harassed and subjected to abuse by officers at the jail because they had been made aware, via media reports, that she was charged with defrauding elderly people. Nevertheless, the trial court denied her motion, finding that the reasons provided by Roberts did not outweigh the State's policy in favor of open judicial proceedings.

As previously noted, Roberts argues that the trial court's denial of her motion to bar cameras from the courtroom constituted error, but we disagree. Although

---

[16] OCGA § 15-1-10.1 (b) (2)-(6).

[17] *Morris Commc'ns, LLC v. Griffin*, 279 Ga. 735, 736 (620 SE2d 800) (2005); *accord McLaurin v. Ott*, 327 Ga. App. 488, 491 (4) (759 SE2d 567) (2014).

17

Roberts's allegations that she was harassed and abused by officers at the jail where she was held are troubling if true, she has failed to demonstrate how such actions, which (even if true) occurred *outside* the courtroom, impacted upon the due process and the truth-finding function of the *judicial proceeding*. Accordingly, we conclude that the trial court did not abuse its discretion in allowing cameras in the courtroom.[18]

3. Roberts further contends that the trial court erred in admitting into evidence earlier indictments for, and her guilty pleas to, similar crimes in the Superior Court of Fulton County. Yet again, we disagree.

In this matter, just before the State rested its case, the State's prosecutor sought to admit into evidence two indictments from the Superior Court of Fulton County, in which Roberts had been similarly charged with identity fraud, financial-transaction-card fraud, and exploitation of an elder person, relating to some of the elderly victims

---

[18] *See Smith v. Gwinnett Cty.*, 270 Ga. 424, 425 (2) (510 SE2d 525) (1999) (holding that despite showing they did not consent to television coverage of the judicial proceedings, defendants failed to demonstrate that other factors under OCGA § 15-1-10.1 (b) (2) weighed in favor of prohibiting such coverage and, therefore, failed to show that trial court abused its discretion in allowing television coverage of the judicial proceedings). *Cf. Griffin*, 279 Ga. at 736-37 (holding that trial court erred in denying the newspaper's motion to use a camera during defendant's trial, because although defendant claimed that his due process rights would be impacted by such use, neither he nor trial court specifically showed how the use of a camera would violate such rights).

she had targeted in Fulton County, and her guilty pleas to those offenses. Specifically, the State argued that the indictments and Roberts's guilty pleas were admissible as evidence of a pattern of racketeering activity. Roberts objected to the admission of these indictments and pleas, but the trial court allowed them into evidence.

Roberts argues that the prejudice in admitting the Fulton County indictments and her guilty pleas into evidence far outweighed their probative value, and thus, such evidence should have been excluded. But the RICO statutory provisions provide for evidence under OCGA § 16-14-3 (2) of "a carefully defined '[p]attern of racketeering activity' that the defendant has engaged in 'within four years after the commission of a prior incident of racketeering activity[.]'"[19] This, in turn, comports with the provisions of OCGA § 16-14-2 (b), "which specifically provides that RICO does not apply to isolated instances of criminal activity."[20] Consequently, given that the State was required to prove a series or pattern of illegal activities, the trial court did not err in admitting the Fulton County indictments and Roberts's guilty pleas to same.[21]

---

[19] *Brown v. State*, 191 Ga. App. 76, 78 (2) (381 SE2d 101) (1989) (punctuation omitted).

[20] *Id.* (punctuation omitted).

[21] *See id.* (holding in defendant's trial on RICO charges that an indictment and sentence in defendant's prior companion case was admissible to prove the requisite

4. Finally, Roberts contends that the trial court erred in denying her claims that her counsel rendered ineffective assistance by failing to object to the State prosecutor's leading questions and by, generally, failing to present an adequate defense. Once again, we disagree.

In order to evaluate Roberts's claim of ineffective assistance of counsel, we apply the two-pronged test established in *Strickland v. Washington*,[22] which requires Roberts to show that her trial counsel's performance was "deficient and that the deficient performance so prejudiced [her] that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different."[23] In addition, there is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct, and a criminal defendant must overcome this presumption.[24] Unless clearly erroneous, this Court "will uphold a trial

pattern of racketeering activity).

[22] 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[23] *Chapman v. State*, 273 Ga. 348, 349-50 (2) (541 SE2d 634) (2001); *see Strickland*, 466 U.S. at 687 (III); *Ashmid v. State*, 316 Ga. App. 550, 556 (3) (730 SE2d 37) (2012).

[24] *Chapman*, 273 Ga. at 350 (2); *see Cammer v. Walker*, 290 Ga. 251, 255 (1) (719 SE2d 437) (2011) ("A claim of ineffective assistance of counsel is judged by whether counsel rendered reasonably effective assistance, not by a standard of

court's factual determinations with respect to claims of ineffective assistance of counsel; however, a trial court's legal conclusions in this regard are reviewed *de novo*."[25] Bearing this framework in mind, we turn now to Roberts's claims.

(a) *Failing to object to leading questions.* During Roberts's trial, the State called as a witness the Fulton County Police Department detective who ultimately tracked down Roberts to the motel on Fulton Industrial Boulevard. And during the detective's direct testimony, the following colloquy with the State's prosecutor regarding his initial encounter with Roberts in the doorway of her motel room occurred:

Q. And at the point, did she identify herself?

A. Well, at that point, I identified myself as Detective Benefield, Fulton County Police, and asked for her name.

Q. What did she say?

A. The name that was given to us the first time was, I believe, Nadine Simmons.

---

errorless counsel or by hindsight." (punctuation omitted)).

[25] *Sowell v. State*, 327 Ga. App. 532, 539 (4) (759 SE2d 602) (2014).

Q. And after she identified herself as Nadine Simmons, what did you all do?

A. It's a common practice to try to establish the identity of the person. I asked if she had any ID. She stated no. Asked for a date of birth.

Q. Did she give a date of birth?

A. Yes, sir. Eventually. The first couple of times when we asked the question, the question was repeated back to us. What's your name? What's my name? What's your name? It was repeated. What's your date of birth? What's my date of birth? It's a common tactic we've seen before. We finally got the date of birth. Once we got the name of Nadine Simmons and the date of birth that was given to us, we had our communications system run that name through the Georgia system, see if it came back to a valid person.

Q. When you said earlier that it was common for you to have someone repeat your question back to you, when this person was repeating the question back to you, did you get the impression that they didn't understand the question?

A. No, sir.

Q. What was your impression?

22

A. My experience as a law enforcement officer is usually when people are trying to think about something in the meantime, whether – sometimes it's an indicator that they're not being totally truthful. It's a stall tactic while they're trying to think up stuff as they go along. That's been my experience.

Q. Okay. *And after you ran the name and the date of birth that was provided to you and you found that there was no person with that name and date of birth in the data system, what did y'all do then?*[26]

A. Advised her I needed to get some sort of ID. We then entered the room to make sure there were not additional people in that room, conducted a safety sweep.

Roberts's trial counsel lodged no objection to this testimony, but did conduct a lengthy cross-examination of the detective.

Roberts argues that the last question in the aforementioned exchange was leading, essentially allowed the State's prosecutor to testify, and that her trial counsel's failure to object constituted ineffective assistance. And during the hearing on Roberts's motion for new trial, her former trial counsel testified that perhaps he should have objected to the question. But counsel further testified that after reading

---

[26] (Emphasis supplied.)

the entire colloquy, the State's prosecutor's earlier questions had already elicited the information she was seeking from the detective, which was essentially that Roberts initially provided police officers with a false identity, and therefore, he did not want to draw further attention to it by objecting.

It is well established that as a general rule, "matters of reasonable trial strategy and tactics do not amount to ineffective assistance of counsel."[27] Specifically, an attorney's decision to "forego objecting to hearsay or to leading questions used to establish routine points constitutes reasonable trial strategy."[28] And here, counsel's supposition that he may not have objected to the question in order to avoid drawing further attention to the issue is certainly reasonable trial strategy, which we are not at liberty to second-guess.[29] But even if trial counsel should have objected to the

[27] *Williams v. State*, 282 Ga. 561, 564 (5) (a) (651 SE2d 674) (2007) (punctuation omitted); *accord Ray v. State*, 338 Ga. App. 822, 832 (5) (a) (792 SE2d 421) (2016).

[28] *Williams*, 282 Ga. at 564 (5) (a); *accord Ray*, 338 Ga.App. at 832 (5) (a).

[29] *See Butler v. State*, 292 Ga. 400, 409 (3) (d) (738 SE2d 74) (2013) (holding that defendant did not meet burden to rebut presumption that trial counsel's failure to object to leading questions was not sound trial strategy); *Kay v. State,* 306 Ga.App. 666, 671-72 (5) (c) (703 SE2d 108) (2010) (holding that tactical decision not to object to statement in order to avoid drawing jury's attention to it did not amount to ineffective assistance of counsel); *Ballard v. State*, 268 Ga. App. 55, 60 (5) (c) (601 SE2d 434) (2004) (holding that trial counsel's speculation that at times he would not

24

question at issue, which rather than leading is more accurately characterized as an assumption of facts not in evidence, Roberts has not demonstrated how such failure prejudiced her case to the extent that a reasonable probability exists that but for this improper question, the outcome of the trial would have been different.[30] Indeed, as trial counsel noted in his testimony, the exchange between the State's prosecutor and the detective prior to the objectionable question had already established that the detective did not believe that Roberts was being truthful when she first provided a false name. Accordingly, the trial court did not err in denying Roberts's claim of ineffective assistance in this regard.

---

object to improper testimony in order to avoid calling the jury's attention to it was reasonable trial strategy).

[30] *See Butler*, 292 Ga. at 409 (3) (d) (noting that defendant failed to show that he was prejudiced by his counsel not objecting to leading questions); *Williams v. State*, 271 Ga. App. 166, 168 (5) (a) (609 SE2d 122) (2004) (holding that defendant did not show that trial counsel's failure to object to leading questions prejudiced his case when witness had already testified to some of the facts elicited by the leading questions); *Reynolds v. State*, 269 Ga. App. 268, 271 (2) (603 SE2d 779) (2004) (holding that trial counsel's failure to object to numerous leading questions did not prejudice defendant's trial); *see also Mangrum v. State*, 291 Ga. 529, 530 (731 SE2d 761) (2012) (noting that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies" (punctuation omitted)).

(b) *Failure to present an adequate defense.* Roberts also argues that her trial counsel rendered ineffective assistance by failing to present any evidence or call any witnesses. But this argument lacks merit. In fact, on appeal, Roberts references no specific witnesses who should have been called or evidence that should have been presented and does not even argue how trial counsel's alleged failure to call these unnamed witnesses and present this unidentified evidence affected the outcome of her trial. And merely alleging that counsel provided ineffective assistance, without more, is "insufficient to establish a claim of ineffective assistance of counsel."[31] Thus, the trial court, likewise, did not err in denying Roberts's claim of ineffective assistance in this regard.

For all these reasons, we affirm Roberts's convictions and the denial of her motion for new trial.

*Judgment affirmed. Ray and Self, JJ., concur.*

---

[31] *Howard v. State*, 340 Ga. App. 133, 139 (3) (a) (796 SE2d 757) (2017) (punctuation omitted); *see Brewer v. State*, 280 Ga. 18, 20-21 (3) (622 SE2d 348) (2005) (holding that defendant's mere allegations of ineffective assistance were insufficient to prevail on such a claim).